IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

MARCUS D. WILSON,

    Petitioner,

v.

JOSEPH MCGRATH,

    Respondent.

        No. C 99-02868 CRB

        **MEMORANDUM AND ORDER**

Now pending before the Court is a petition for a writ of habeas corpus filed by Marcus D. Wilson. The petition challenges the constitutionality of Wilson's guilty plea for robbery, first-degree murder, and illegal possession of firearms. For the reasons set forth below, the petition is DENIED.

## **FACTS**[1]

On May 24, 1994, Manuel Gonzales was robbed and killed behind a store selling adult videos and books in Mountain View, California. A store employee witnessed the crime, but could not identify the hooded assailant. The witness told police that he had seen a single

---

[1] The Court has determined the facts of this case relying almost exclusively on exhibits submitted by the State of California in its opposition to Wilson's petition. See Mem. of P. & A. in Supp. of Answer to Pet. for Writ of Habeas Corpus, Ex. 1-20 (hereinafter "State's Opp."). The Court's reliance on these documents is necessary for two reasons. First, it is the State's task, under the local rules of this Court, to provide the relevant state-court records in a proceeding under 28 U.S.C. § 2254. See N.D. CAL. HABEAS CORPUS R. 2254-6(b)(3). Second, the *pro se* petition in this case provides no supporting evidence, and the supporting memo prepared by Wilson's attorney contains almost no discussion of facts. And despite the fact that this Court granted an extension of time, no traverse was filed.

1 assailant try to pry something from Gonzales's grasp. According to this witness, the
2 assailant then shot Gonzales three times, wrested the object from Gonzales's control, and
3 fled. In a subsequent search of the crime scene, the police found the murder weapon, a .38
4 caliber snub-nosed revolver, underneath a table outside a nearby apartment complex.

5     Wilson became a suspect in the shooting after another witness, an acquaintance of
6 Wilson, told police that he had seen Wilson visit the same apartment complex on the
7 following morning. This acquaintance stated that Wilson had been searching for something
8 in the location where the gun was found and that, after the witness approached him, Wilson
9 became flustered. This witness also told police that Wilson had previously made comments
10 about how easy it would be to rob the people who frequently loitered at the rear of the adult
11 bookstore.

12     Wilson, who was on probation at the time for prior assault convictions,[2] was
13 summoned for questioning. According to Wilson, his probation officer called him for
14 questioning, leading him to believe that the interrogation was merely a routine check-in
15 related to the terms of his probation. Instead, Wilson found himself before two police
16 officers. Wilson does not dispute that the officers informed him of his Miranda rights, but he
17 contends that the police continued questioning him even after he had requested an attorney.
18 Wilson admitted to the officers that he had visited the apartment complex the morning after
19 the murder, but he claimed he had been there to retrieve his mail. When police asked him
20 why his fingerprints "may be on the gun," Wilson acknowledged that he had previously

---

[2] Wilson's prior convictions for assault relate to a shooting that took place at the Funtastic Traveling Carnival Show in Mountain View, California, on November 8, 1992. At the carnival, Wilson and two friends were confronted by members of a local gang. When the gang members began fighting with Wilson, security officers told the group to leave the carnival. Upon leaving, the gang resumed its fight with Wilson, attacking him with weapons such as pieces of lumber and metal pipes. Afraid, Wilson drew a gun and fired multiple shots into the crowd. He fled with his friends to his vehicle, all while being pursued by the gang members. While attempting to start the car, one gang member struck Wilson in the face with a board, and Wilson shot him in the stomach. Wilson escaped, but his friend was caught by the gang members while trying to get into the car. The friend was beaten by the gang and stabbed five times. In the end, three people were injured by Wilson's shots — one bystander who was shot in the ankle, another bystander who was shot in the leg, another bystander who was lucky enough to be shot in his wallet, and the alleged gang member who was shot twice in the abdomen. Wilson pled guilty to the assault charges. He later stated that he "wishe[d] he had taken the matter to trial."

2

handled several guns, including a revolver of the same caliber as the one recovered at the crime scene. See State's Opp., Ex. 14, at 2. Wilson denied any involvement in the shooting. Wilson also admitted to police during this questioning that he was in possession of a "9mm magazine," which authorities subsequently found in Wilson's sock drawer during a probationary search. Id. at 3.

Four days later, police again questioned Wilson, this time during a polygraph examination. During this session, Wilson admitted going to the apartment the morning after the crime, but he again insisted that he had been there to retrieve mail. Wilson again specifically denied any knowledge of or involvement in the shooting. According to the polygraph examiner, Wilson's responses demonstrated "emotional reactions indicative of deception to all relevant questions." State's Opp., Ex. 15, at 2.

Upon subsequent questioning by the police, Wilson finally admitted involvement in the crime — but only as an accomplice. He claimed that he had originally planned to rob the bookstore with a man named Terry Jackson. Wilson claimed that he and Jackson had approached the rear of the adult bookstore and had confronted Gonzales and demanded his money. Wilson told police that Jackson then drew the gun and fired the fatal three shots. He claimed that he and Jackson split the $86 they took from Gonzales's wallet, and that he then helped Jackson by disposing of the gun at the nearby apartment complex. He stated that he had returned to the apartment complex the following day to retrieve the gun, and he admitted to the police that he had purchased the gun several months earlier in San Jose. (Jackson, by contrast, denied involvement and passed a polygraph test.)

Three days later, on June 27, 1994, state authorities filed a felony complaint against Wilson, charging him with robbery, first-degree murder, and illegal possession of a firearm. An attorney at the Santa Clara County Public Defender's Office, Tim Fukai, was appointed to represent Wilson. At the time, Fukai had been with the public defender's office for seven years and was serving on the office's trial unit for homicides. He had previously represented four to five defendants against homicide charges, and he had handled two cases that had gone to trial. None of Fukai's prior cases involved capital murder charges.

3

1    According to Fukai, an intake attorney initially interviewed Wilson about the case.
2 During that interview, Wilson admitted to being the shooter and stated that he had gone to
3 the scene with a gun and a bandana intending to rob the adult bookstore. Wilson further
4 confessed that he was the lone gunman in the incident. Thus, according to Fukai, the
5 information that Wilson gave to his attorneys was dramatically different than the information
6 he had provided to the police, to whom Wilson had admitted only accomplice liability.
7 Indeed, Fukai stated that Wilson never mentioned anything about an alibi and never raised
8 the issue of any potential alibi witnesses.

9    In preparing for the case, Fukai received copies of all police reports, as well as audio
10 tapes and videotapes kept by the police during their interrogations. He also visited the crime
11 scene. Fukai did not, however, hire an investigator to conduct any independent investigation
12 into the facts of the case, and he states that he has no recollection of reviewing the physical
13 evidence gathered by the police. Fukai also stated that during the investigation he was "alert
14 for information . . . that might support motions to suppress," but that Wilson never spoke
15 about any Miranda violations and never indicated that he had made any request for a lawyer
16 during the several police interrogations. State's Opp., Ex. 19, ¶¶ 17, 19 (hereinafter "Fukai
17 Decl.").

18    After reviewing the prosecutor's case against his client, Fukai became concerned
19 about Wilson's exposure. Due to the prior assault charges, Wilson faced a possible
20 mandatory sentence of twenty-five-to-life under California's Three Strikes Law. See Cal.
21 Penal Code § 667(e)(2). In addition, due to the circumstances surrounding the shooting,
22 Wilson also faced the risk that the prosecutor would file a special allegation, which would
23 have subjected him to a possible death sentence.

24    Prior to trial, the prosecutor informed Fukai that he would put off the filing of any
25 special circumstances or enhancements for one week, during which time Wilson would be
26 able to accept a plea to the unamended indictment. The prosecutor stated that the plea offer
27 would expire at the end of the week. Fukai recognized that he had "little to no room for
28 negotiation on what the terms of what the plea agreement would be." Fukai Decl. ¶ 12.

4

Nonetheless, he concluded that "the plea agreement was the only way Mr. Wilson had any chance of hoping to get out of prison at some point in his life." Id. ¶ 19.

Fukai communicated this view to Wilson. Fukai states that he spent "a significant amount of time thoroughly explaining" to Wilson "the evidence against him." Id. ¶ 13. He also asserts that he obtained a court order so that Wilson could have a tape recorder to review the recordings of the police interrogations. Fukai states that he further informed Wilson about "the maximum potential sentence he faced" and indicated that a plea agreement was Wilson's "best chance" to avoid a sentence of either death or life imprisonment without parole. Id. ¶ 13, 15. Additionally, Fukai states that he explained the terms of the plea agreement to Wilson, as well as the various constitutional rights that Wilson would relinquish by pleading guilty. Fukai recalls Wilson as "an articulate and bright young man . . . [who] gave every indication that he understood the gravity of the situation he was facing." Id. ¶ 15.

## STATE COURT PROCEEDINGS

Wilson pled guilty to all three felony counts — robbery, first-degree murder, and illegal possession of a firearm — on August 11, 1994. At a change of plea hearing, Wilson participated in a plea colloquy in which he indicated that he was pleading guilty knowingly and voluntarily, and that he had taken time to discuss possible defenses with his attorney.

The trial court sentenced Wilson to a total term of 33 years to life. The court imposed a sentence of 30-years-to-life for the murder, which included an additional "aggravated term" of five years because Wilson had used a pistol to commit the killing. See State's Opp., Ex. B, at 6-7. The court also imposed a consecutive sentence of three years on the charge of illegally possessing a firearm. The court stayed a separate five-year sentence for the robbery. On direct appeal, Wilson challenged the trial court's decision to impose separate punishments for the murder and firearms charges, arguing that the court had improperly sentenced him twice for the same conduct. See Cal. Penal Code § 654 ("An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall

the act or omission be punished under more than one provision."). The California Court of Appeal rejected this argument, finding that the two charges involved separate conduct on the basis of Wilson's own admission that he had purchased the weapon in San Jose well before he committed the murder. State's Opp., Ex. 7, at 5.

Wilson then filed a collateral attack on his conviction in state court. State's Opp., Ex. 8. His claim then, as now, was that his trial attorney had rendered constitutionally deficient assistance. The theory of this claim was that his attorney had failed to investigate the facts surrounding his interrogation and how the evidence against him had been obtained. He argued that if he had known about the possibility that meritorious challenges could have been brought on his behalf to challenge the evidence against him, he would not have agreed to plead guilty and instead would have proceeded to trial. In a two-page order, the Santa Clara County Superior Court denied his claim. State's Opp., Ex. 9. The court stated:

> In the case at bar, Petitioner has not established that a motion to suppppress items seized during a probation search would have been successful. Moreover, Petitioner has not shown that any such suppression would have precluded Petitioner's guilty plea to the murder charge. Instead, it appears that the other evidence regarding Petitioner's involvement in this murder, including Petitioner's own statements, would have supported Petitioner's decision to plead guilty.

Id. at 2. The California Court of Appeal summarily affirmed the denial of habeas relief. State's Opp., Ex. 10. So did the California Supreme Court. State's Opp., Ex. 12.

**FEDERAL HABEAS PROCEEDINGS**

Wilson next filed a habeas petition with this Court. The Court initially dismissed Wilson's petition as untimely, finding that Wilson had failed to submit the petition prior to the one-year filing deadline set forth under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L.No. 104-132, 110 Stat. 1214 (codified as amended at 28 U.S.C. § 2244(d)(1)). On appeal, however, the Ninth Circuit reversed and remanded for a determination as to whether Wilson was entitled to equitable tolling of the filing deadline. Wilson v. Ayers, 74 Fed. Appx. 717 (9th Cir. 2003). Specifically, the Ninth Circuit directed this Court to consider "whether frequent lockdowns at Pelican Bay State Prison, along with a policy of requiring inmates to show written proof of court deadlines to gain consistent access

to the library, created an impediment to petitioner's timely filing entitling petitioner to equitable tolling." Id. at 717 (directing the district court to explore "the type of matters set forth in Wilson's notice of appeal"). See also Whalem/Hunt v. Early, 233 F.3d 1146, 1146-47 (9th Cir. 2000) (en banc) (remanding for a determination whether the unavailability of legal materials would constitute "an impediment to filing an application" under AEDPA).

On remand, the State of California ultimately elected to forego the extensive discovery that would have been required to challenge Wilson's contention that prison policies entitled him to equitable tolling. See Chaker v. Crogan, 428 F.3d 1215, 1220 (9th Cir. 2005) (noting that the State may waive the deadline imposed under AEDPA by failing to raise it as an affirmative defense). Instead, the State moved to dismiss Wilson's petition on the ground that it improperly presented both exhausted and unexhausted claims. See 28 U.S.C. § 2254(b) (requiring a prisoner to exhaust all claims in state collateral proceedings before asserting them in a federal habeas petition); Rose v. Lundy, 455 U.S. 509 (1982) (holding that a district court must dismiss mixed petitions, "leaving the prisoner with the choice of returning to state court to exhaust his claims or of amending or resubmitting the habeas petition to present only exhausted claims"). This Court denied the State's motion, holding that Wilson's *pro se* state-court habeas petition, liberally construed, had fairly presented the various allegations of ineffective assistance of counsel now asserted in his federal petition.

Now pending before the Court is Wilson's habeas petition, which makes numerous allegations of ineffective assistance by counsel. Specifically, Wilson asserts that his attorney's performance was unreasonable for the following reasons: (1) the attorney failed to interview alibi witnesses; (2) the attorney failed to file a motion to suppress evidence obtained during the probationary search of Wilson's apartment; (3) the attorney failed to file a motion to suppress statements that Wilson made to interrogators after he had allegedly requested an attorney's assistance; (4) the attorney failed to advise Wilson of the rights he

7

waived as a result of pleading guilty and coerced him into pleading guilty.[3] Wilson claims that he pled guilty only as a result of these errors and omissions by his attorney, and that he would have elected to proceed to trial if his attorney had not rendered such unreasonably ineffective assistance.

## STANDARD OF REVIEW

Both parties agree that AEDPA governs Wilson's petition, which was filed after the statute went into effect on April 24, 1996. See Lindh v. Murphy, 521 U.S. 19, 24 (2002). Under AEDPA, federal habeas relief is available under only two circumstances. First, a petitioner is entitled to relief if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). This basis for relief is irrelevant to Wilson's petition; he does not contend that the state court's factual findings, to the extent that it made any, were unreasonable.[4] Instead, Wilson's petition rests on the argument that the California court's

---

[3] Wilson repeatedly asserts that his attorney also "failed to investigate the facts" of the case. It is unclear precisely what this allegation entails. Fukai admits that he did not undertake a major independent investigation into the circumstances of the murder. See Fukai Decl. ¶ 9 ("I did not and do not now feel that viewing the physical evidence was an important step to take in preparing Mr. Wilson's case. Based on the nature of the case, I determined that there was no need for me to employ an investigator."). But Wilson does not explain what Fukai would have uncovered if there had been such an investigation. To the extent that Fukai's non-investigation relates to his failure to interview potential alibi witnesses, to bring a motion to suppress evidence found during a probationary search, or to bring a motion to suppress Wilson's statements to police, those specific issues are addressed below. To the extent that Fukai's failure to investigate the facts of the case may relate to some other evidence that the attorney should have unearthed, Wilson does not provide sufficient allegations to support his claim. See See James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").

[4] In reviewing the state court's decision, a federal habeas court "looks through" any summary or unreasoned dispositions and evaluates "the last reasoned decision" issued by the state courts. Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991). See also Insyxiengmay v. Morgan, 403 F.3d 657, 665 (9th Cir. 2005) ("On habeas review of a state court judgment, we look to the last reasoned decision of the state court as the basis of the state court's judgment."). Here, the California Supreme Court and the California Court of Appeal denied relief summarily. The only reasoned decision issued in this case by the California courts was that of the Santa Clara County Superior Court. That decision, which is quoted above at length and forms the basis for this Court's review, contains only three paragraphs. The first describes Wilson's claim of ineffective assistance, the second articulates the applicable legal standard, and the third explains the court's decision that Wilson's petition failed to meet that standard. The decision thus contains no relevant factual findings for Wilson to challenge as unreasonable. Further, Wilson has made no attempt to show, much less by clear and convincing evidence, that any of the state

8

legal conclusions were inconsistent with applicable constitutional principles. This contention is addressed by the second basis for habeas relief under AEDPA, which provides that a federal court may issue the writ where a state court's adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

The Supreme Court has instructed that this statutory provision sets forth two distinct tests, either of which, if satisfied, supports granting the writ. The first "contrary to" test provides that "a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). The second "unreasonable application of" test provides that "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."

Only the second of these two tests is at issue in this case. That is, Wilson does not contend that his case is "materially indistinguishable" from any particular Supreme Court decision. Instead, his argument is that the California courts unreasonably applied the governing legal principles to his claims for relief.

## DISCUSSION

The governing legal principles in this case stem from the Supreme Court's decision in Strickland v. Washington, 466 U.S. 668 (1984). In that case, the Court reaffirmed that criminal defendants have a right under the Sixth Amendment to effective assistance of counsel. Id. at 686 (citing McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970)). The Strickland Court explained that a defendant is denied this constitutional right when (1) his attorney's performance falls "below an objective standard of reasonableness," id. at 688, and

---

court's ostensible factual determinations were incorrect. See 28 U.S.C. § 2254(e)(1) (providing that a federal habeas court must presume that "a determination of a factual issue made by a State court [is] correct" and must accept such factual determinations unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence.").

9

1  (2) this deficient performance actually results in prejudice to the defendant, id. at 692. For
2  purposes of AEDPA, the Supreme Court has established that the two-part test articulated in
3  Strickland is "clearly established" precedent sufficient to sustain habeas relief. Williams,
4  529 U.S. at 390-91.
5      In assessing the reasonableness of an attorney's performance, this Court must remain
6  mindful that there are "countless ways to provide effective assistance in any given case," and
7  the Court therefore must make "every effort . . . to eliminate the distorting effects of
8  hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate
9  the conduct from counsel's perspective at the time." Id. at 689. For this reason, the Court
10 "indulge[s] a strong presumption that counsel's conduct falls within the wide range of
11 reasonable professional assistance," and a petitioner "must overcome the presumption that,
12 under the circumstances, the challenged action 'might be considered sound trial strategy.'"
13 Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)).
14     With respect to prejudice, the petitioner must demonstrate that "but for counsel's
15 unprofessional errors," there is a "reasonable probability that . . . the result of the proceeding
16 would have been different." Id. at 694. It is insufficient for the petitioner to show merely
17 "that the errors had some conceivable effect on the outcome of the proceeding." Id. at 693.
18 Conversely, the petitioner need not show "that counsel's deficient conduct more likely than
19 not altered the outcome in the case." Id. Instead, the defendant must demonstrate that his
20 attorney's errors were "sufficient to undermine confidence in the outcome" of the
21 proceedings. Id. at 694.
22     In this case, of course, Wilson pled guilty. Typically, a prisoner can withdraw his
23 guilty plea only upon showing that he did not enter into the plea knowingly or voluntarily.
24 See, e.g., North Carolina v. Alford, 400 U.S. 25, 31 (1970); Boykin v. Alabama, 395 U.S.
25 238, 242 (1969). The Supreme Court has recognized, however, that a prisoner can show his
26 plea to be unknowing or involuntary by demonstrating that his attorney misrepresented or
27 mischaracterized the consequences of pleading guilty. In Hill v. Lockhart, 474 U.S. 52
28 (1985), the Court stated:

10

> Where, as here, a defendant is represented by counsel during the plea process and enters his plea upon the advice of counsel, the voluntariness of the plea depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases. . . .
>
> Although our decision in Strickland v. Washington dealt with a claim of ineffective assistance of counsel in a capital sentencing proceeding, and was premised in part on the similarity between such a proceeding and the usual criminal trial, the same two-part standard seems to us applicable to ineffective-assistance claims arising out of the plea process.

Id. at 56-57. As with most other claims for ineffective assistance of counsel, a defendant who pleads guilty must show that his attorney's errors "actually had an adverse effect on the defense." Id. at (quoting Strickland, 466 U.S. at 693). In other words, in the context of a guilty plea, the defendant must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Id. at 59. With these principles in mind, the Court turns to petitioner's various allegations of ineffective assistance.

### First Allegation of Ineffectiveness: Failure to Interview Alibi Witnesses

Wilson alleges that he requested his attorney to interview witnesses "in order to establish an alibi for the murder." He claims that his attorney failed to conduct any such investigation and, despite these requests, never sought to locate any witnesses who could have established an alibi. Wilson claims that this failure constitutes ineffective assistance of counsel. See, e.g., Rompilla v. Beard, 125 S. Ct. 2456, 2463 (2005) (granting habeas relief under AEDPA where an attorney failed to examine court files regarding the client's prior convictions); Wiggins v. Smith, 539 U.S. 510, 534 (2003) (granting habeas relief under AEDPA where an attorney failed to investigate mitigating circumstances).

Wilson would have a plausible claim to relief if he provided some support for these allegations. He does not. Indeed, Wilson provides no specific facts regarding the theory of his purported alibi. For example, he gives no explanation about whether he was elsewhere at the time of the murder, or why he could not have been the shooter. He identifies no witnesses who could have supported an alibi defense, nor does he provide any indication about what such witnesses would have said. Simply put, he offers no alibi at all. Instead, he simply claims that his attorney was deficient for failing to discover one. Without specific

11

details to support his allegations, Wilson cannot establish that his attorney's failure to pursue an alibi defense was prejudicial. See James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").

Also, the record in this case gives no indication that Wilson himself ever considered or raised an alibi defense during pre-trial proceedings. Neither the police reports, nor the interrogation reports, nor the probation officer's report mentions anything about an alibi. To the contrary, the record indicates that Wilson affirmatively disavowed an alibi. Wilson admitted both to the public defender's office and to the police that he was involved in the crime. Moreover, the morning after the murder Wilson was spotted at the apartment complex where the murder weapon had previously been discovered, searching for something in the very same area. In short, the record dovetails much more smoothly with Fukai's statement that Wilson never raised the possibility of an alibi than it does with Wilson's account that he repeatedly requested his attorney to meet with alibi witnesses. See Fukai Decl. ¶ 16 ("At no time did Mr. Wilson ever mention to me that he had an alibi, much less provide me with the names of any witnesses that might support an alibi defense.").

Even if it is not possible on the record as it now exists for the Court to determine exactly what Wilson requested of his attorney, it is also not possible to say that Fukai's decision not to pursue alibi evidence or witnesses was beyond the pale of reasoned, professional judgment. See Strickland, 466 U.S. at 690-91 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."); see also Burger v. Kemp, 483 U.S. 776, 794-95 (finding that "counsel's decision not to mount an all-out investigation" was reasonable in light of the evidence against the defendant and defendant's own admissions).

**Second Allegation of Ineffectiveness: Failure to Suppress Evidence**

Wilson also contends that his attorney was ineffective for failing to bring a motion to suppress evidence seized during the probationary search of Wilson's apartment. Wilson

12

notes that he was initially summoned for questioning by his probation officer, and there is no dispute that Wilson relinquished his house keys after the probation officer's request to conduct a search. Wilson claims that the real motive of the search was to look for evidence related to the murder, and that the police used the probation officer as a "stalking horse" to do their dirty work, thereby circumventing the requirement of a warrant. As a result, the police obtained several items of evidence, including ammunition recovered from Wilson's sock drawer. He argues that such evidence was unconstitutionally seized, and that his attorney provided defective assistance by failing to contest it.

Wilson's claim is without merit. The probation officer had sufficient authority to conduct the search, regardless of his purpose or motive in summoning Wilson on behalf of the police. The Fourth Amendment provides less protection to a probationer who is subject, as Wilson was at the time of the search, to a probation condition requiring him to "submit [his] person, place of residence, vehicle and any property under his control to search at any time without a warrant by any Peace Officer." State's Opp., Ex. A, at 43. The Supreme Court has held that a California probation officer may conduct a search of a probationer such as Wilson even when there is only "reasonable suspicion" that he is involved in criminal activity — a standard much less burdensome than the usual benchmark of probable cause. See United States v. Knights, 534 U.S. 112, 121 (2001); see also United States v. Stokes, 292 F.3d 964, 967 (9th Cir. 2002) ("[O]ur circuit's line of cases holding searches of probationers invalid on the ground that they were subterfuges for criminal investigations is, in that respect, no longer good law.").

Here, the probation officer had reasonable suspicion. (And it would not have been unreasonable for Fukai to conclude, as he did, that the authorities had probable cause as well. See Fukai Decl. ¶ 17(b).) A witness had stated that he saw Wilson the morning after the murder searching for an object precisely where the murder weapon had been found. The same witness had told police about a conversation in which Wilson had discussed how easy it would be to rob someone behind the adult bookstore where the crime took place. Also, contrary to Wilson's contention that the probation officer lacked reason to suspect any

13

contraband at the premises, the probation officer also had justification to search Wilson's home given Wilson's admission during interrogation that he was in possession of firearms ammunition — a violation of the terms of his probation. In short, the probation officer had ample justification for a search. Any motion to suppress the fruits of that search could not have succeeded, and Fukai did not perform unreasonably by failing to bring such a motion. See Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996) ("[T]he failure to take a futile action can never be deficient performance . . . ."); James, 24 F.3d at 27 ("Counsel's failure to make a futile motion does not constitute ineffective assistance of counsel.").

### Third Allegation of Ineffectiveness: Failure to Suppress Statements

Wilson next alleges that his attorney failed to explore the possibility of suppressing statements and confessions Wilson made during his initial interrogation with the police. Wilson claims that he asked for an attorney midway through this interrogation and that the police unconstitutionally continued to question him. See, e.g., Miranda v. Arizona, 384 U.S. 436, 474 (1966) ("If the individual states that he wants an attorney, the interrogation must cease until an attorney is present."); see also People v. Braeseke, 602 P.2d 384, 390 (Cal. 1979) ("It is beyond dispute that once a defendant has asserted his right to counsel the interrogation must cease.").

The record casts doubt upon Wilson's assertion that he invoked his right to an attorney at any point during the initial interrogation. The interrogation report, for example, states that Wilson was advised of his rights under Miranda, understood them, and freely waived them. In subsequent interrogations, such as during his polygraph examination, Wilson also explicitly consented to examination, both orally and in writing. Also, the record indicates that the police taped the interrogations it conducted with Wilson, and no suggestion has ever been made that these tapes provide evidence of Wilson's supposed request for representation. While the Court makes no finding as to the truth of Wilson's assertions, defense counsel could reasonably conclude that Wilson affirmatively assented to questioning. And Wilson has not pointed to any piece of evidence in existence prior to his habeas petition that makes any mention of his purported request for an attorney.

14

1    Putting these evidentiary issues aside, Wilson's claim fails for a simple reason:
2 Wilson never informed Fukai that he had requested an attorney during the interrogation.
3 Fukai asserts that Wilson did not "raise such an accusation with me or provide me with any
4 facts that might support bringing a motion for Miranda violations, including the possibility
5 that any 'off-tape' requests for counsel that he made were denied." Fukai Decl. ¶ 18. Wilson
6 does not allege otherwise. Instead, his claim rests on the argument that Fukai provided
7 inadequate assistance by failing to investigate the circumstances of the interrogation and
8 discover the grounds for suppression. Given the record in the case, this Court cannot find
9 that Fukai's conduct was so unreasonable as to fall outside of "prevailing professional
10 norms." Strickland, 466 U.S. at 688.

**Fourth Allegation of Ineffectiveness: Failure to Advise**

12    Wilson claims that Fukai did not advise him of his constitutional rights before he
13 entered into the plea agreement. He claims that Fukai's performance was constitutionally
14 defective due to this lack of adequate consultation about these and other consequences of
15 entering a guilty plea.

16    The Court finds these allegations unsupportable. First, they are contrary to the sworn
17 declaration of Fukai, who states that he explained to Wilson "the evidence against him and
18 the potential sentences, . . . the terms of the plea agreement, including sentence, as well as the
19 constitutional rights he would be waiving by entering a guilty plea, and the plea colloquy
20 process." Fukai Decl. ¶ 13. It is doubtful that an experienced public defender would fail to
21 inform his client in any respect about the consequences of pleading guilty. Second, the
22 allegations run contrary to Wilson's own affirmation at the plea colloquy that he "had ample
23 time to discuss with [his] attorney the various elements that make up the offense as charged
24 in the complaint, and . . . any possible defenses that [he] might have [had]." Indeed, Wilson
25 specifically confirmed at the plea colloquy that he understood the various rights he was
26 relinquishing by virtue of his plea, including the right to preliminary examination, the right to
27 jury trial, the right to confront witnesses, and the privilege against self-incrimination.
28 Finally, Wilson's allegations are suspect in light of the Wilson's previous encounters with

15

the criminal justice system. Of particular significance is the fact that Wilson had pled guilty on a prior occasion to assault charges; indeed, in an interview Wilson indicated to a probation officer that he "wishe[d] he had taken the [prior] matter to trial." State's Opp., Ex. 1, at 17. Wilson made no such statement to the probation officer with respect to his guilty plea to the murder charges. The evidence thus undermines Wilson's claim that he misunderstood the consequences of his plea or lacked awareness of the constitutional rights he surrendered by pleading.

Furthermore, Wilson does not identify any particular consequence of the guilty plea of which he was unaware, nor does he cite any constitutional right that he would have exercised if he had known about it. For this reason, too, Wilson's claim does not warrant habeas relief. See Borg, 24 F.3d at 26. Unlike other cases in which an attorney's failure to advise has led to a grant of habeas relief, Wilson does not identify any specific misrepresentation that induced his guilty plea. See U.S. v. Jeronimo, 398 F.3d 1149, 1155 (9th Cir. 2005) (noting the allegation that counsel had failed to inform the defendant of "the possibility that he might be sentenced as a career offender"); Iaea v. Sunn, 800 F.2d 861, 864 (9th Cir. 1986) (noting that counsel had erroneously informed the defendant "that he was subject to Hawaii's minimum sentencing law, that there was almost no chance of his receiving an extended or life sentence, and that he had a chance to receive probation if he pled guilty," all of which was "faulty"); see also United States v. Michelin, 34 F.3d 896, 899 (9th Cir. 1994) (dismissing an appeal where the defendant was informed of his rights during a plea colloquy and where the defendant had provided the court with "no basis on which to determine whether or not his attorney grossly mischaracterized the consequences of pleading guilty").

Finally, even accepting as true Wilson's allegation that Fukai coercively advised him to plead guilty, the petition is still insufficient to establish that his plea was unknowing or involuntary. There is no dispute in this case that Fukai urged Wilson to plead. See Fukai Decl. ¶ 19 ("My opinion . . . has not changed during the intervening years. Accepting the plea agreement was the only way Mr. Wilson had any change of hoping to get out of prison at some point in his life. The plea agreement was definitely in Mr. Wilson's best interest

16

1 based upon the circumstances that he faced."); id. ¶ 15 ("[Wilson] gave every indication that
2 he understood the gravity of the situation he was facing if he went to trial and that the plea
3 agreement he accepted was his best chance at avoiding either a death sentence or [life
4 without parole]."). In fact, according to Wilson's state-court pleadings, Fukai urged him to
5 "take the deal" because Fukai didn't think it was possible for him to "beat" the charges.
6 State's Opp., Ex. 8, at 3. Nonetheless, that strong advice does not vitiate Wilson's consent to
7 the guilty plea.

8     It is well-established that an attorney's recommendation to his client to plead guilty
9 does not render the client's decision involuntary or unknowing. See Iaea, 800 F.2d at 867
10 ("Mere advice or strong urging by third parties to plead guilty based on the strength of the
11 state's case does not constitute undue coercion."). Indeed, an attorney's candid evaluation of
12 the benefits of a plea is precisely what ensures that a defendant enters into a plea knowingly.
13 See Brady v. United States, 397 U.S. 742, 755 (1970) ("Since an intelligent assessment of the
14 relative advantages of pleading guilty is frequently impossible without the assistance of an
15 attorney, this Court has scrutinized with special care pleas of guilty entered by defendants
16 without the assistance of counsel and without a valid waiver of the right to counsel."). Thus,
17 to prevail on his claim of inadequate advice and coercion, Wilson must demonstrate more
18 than that Fukai urged him to plead guilty. Instead, Wilson must show "actual or threatened
19 physical harm or . . . mental coercion overbearing the will of the defendant." Id. at 750.
20 Wilson falls short of that requirement here. There is no evidence in the record to indicate
21 that Wilson experienced such extreme duress due to his attorney or any other influence.[5]

---

[5] Wilson cannot contend that the prosecutor's decision to forego filing special allegations for a week while Wilson considered the plea was unduly coercive. See Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978) ("While confronting a defendant with the risk of more severe punishment clearly may have a 'discouraging effect on the defendant's assertion of his trial rights, the imposition of these difficult choices [is] an inevitable' — and permissible — 'attribute of any legitimate system which tolerates and encourages the negotiation of pleas.'" (quoting Chaffin v. Stynchcombe, 412 U.S. 17, 31 (1973) (alteration in original)). Nor can he claim the specter of the death penalty or other serious punishment vitiates his consent to plead guilty. See Brady, 397 U.S. at 755 ("[A] plea of guilty is not invalid merely because entered to avoid the possibility of a death penalty.").

**CONCLUSION**

In sum, Wilson cannot prevail on any of his myriad claims of ineffective assistance of counsel.[6] *A fortiori*, he cannot demonstrate that the California courts' rejection of those claims "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). This Court "may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 539 U.S. at 411. Here, the California courts did not unreasonably reject Wilson's claims of ineffective assistance. The petition for writ of habeas corpus is therefore DENIED.

**IT IS SO ORDERED.**

Dated: September 29, 2006

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE

---

[6] Nor is Wilson entitled to an evidentiary hearing on any of his claims. Wilson relies on no new rule of constitution law, much less one that has been made retroactive. He presents no new evidence, and he advances no allegations that could not have been previously discovered through the exercise of due diligence. Under AEDPA, these circumstances disqualify Wilson from the hearing he seeks. See 28 U.S.C. § 2254(e)(2)(A). In contrast to other cases in which petitioners have demonstrated diligence in developing a factual basis for their claims, see, e.g., Landrigan v. Schriro, 441 F.3d 638, 642-43 (9th Cir. 2006), Wilson has submitted only a vague affidavit. Given the lack of specific facts to support Wilson's conclusory allegations or any concrete indication of what an evidentiary hearing would uncover, this court finds no cause to conduct such a hearing, or to pursue further discovery, regarding Wilson's claims of ineffective assistance. See Bracy v. Gramley, 520 U.S. 899, 904 (1997).